UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :     Chapter 7

MYLOTTE, DAVID & FITZPATRICK        :

        Debtor                          :     Bankruptcy No. 07-11861bif

.................................................

MEMORANDUM

.................................................

On March 23, 2007, Mr. Frederick C. Hanselmann ("Hanselmann") filed an

involuntary chapter 7 petition against the partnership known as Mylotte, David &

Fitzpatrick ("Mylotte").  In accordance with an order dated May 23, 2007,  Mylotte filed

an answer in opposition to the involuntary petition, pursuant to Fed. R. Bankr. P. 1003(b)

and 1011.

In its answer, Mylotte asserted that the petition should be dismissed because

Mylotte had more than eleven qualified creditors at the time this involuntary case

commenced, and so the involuntary petition was defective under 11 U.S.C. § 303(b)(1) in

that three petitioning creditors—rather than Mr. Hanselmann alone—were required to

initiate this action.  (A list of Mylotte's creditors was attached to the answer.  See Fed. R.

Bankr. P. 1003(b)).  Alternatively, Mylotte alleged that if a sole petitioning creditor could

properly file an involuntary petition under 11 U.S.C. § 303(b)(2), Mr. Hanselmann was

not so qualified.  The putative debtor asserted that Mr. Hanselmann held a claim subject

to a bona fide dispute.[1]

---

[1]The involuntary petition does not seek relief under section 303(b)(3).

After Mr. Hanselmann filed his involuntary petition, four creditors filed requests to join in the petition pursuant to 11 U.S.C. § 303(c): Arden Seven Penn Partners, L.P. alleging that it holds a judgment against Mylotte in the amount of $377,000; Graebel Companies, Inc., alleging that it holds a claim in the amount of $13,399.63; Summit Court Reporting, Inc., asserting a claim of $7,843.35; and Sir Lancellot Courier and Delivery Service, asserting a claim of $1,754.82.  Mylotte contends that these joinder requests cannot be allowed because Mr. Hanselmann filed the involuntary petition in bad faith: viz., he knew or should have known that Mylotte had more than eleven qualified creditors and so three petitioners were needed to initiate this involuntary case.

A two day trial was held on the involuntary petition and Mylotte's opposition thereto.  After consideration of the evidence presented, I find that the following facts relevant to the contested involuntary petition were proven.[2]

---

[2]The factual findings under Fed. R. Bankr. P. 7052 will be made in narrative format.  Moreover, it would be inappropriate to resolve the merits of the underlying claims involving Mr. Hanselmann and Mylotte.  See In re Biogenetic Technologies, Inc., 248 B.R. 852, 856 (Bankr. M.D. Fla. 1999).  I shall simply determine the issues posed by section 303 of the Bankruptcy Code.  Thus, certain exhibits and testimony will not be addressed as they do not affect the outcome of this dispute.

I.


A.


Mylotte was a partnership that operated as a law firm since 1979.  At all relevant times, the firm had three "equity partners," plus various non-equity partners and associate attorneys.  Mr. Hanselmann was hired as an associate attorney in the early 1990's and soon became a non-equity partner.  An unwritten compensation agreement between Mr. Hanselmann and Mylotte was entered into,[3] involving the payment to Mr. Hanselmann of weekly or bi-weekly draws.  Mr. Hanselmann avers that he holds a claim against the law firm for missed draw payments.  Mr. Hanselmann also asserts that he holds a claim for unpaid monthly car allowance.  Mylotte denies that it ever agreed to pay such an allowance to Mr. Hanselmann.

There appears to be no dispute that Mylotte suffered cash flow problems for a number of years.  As a result, it is admitted that there would be weeks in which it had insufficient funds to pay partner draws.  When sufficient cash was later available, Mylotte would retroactively pay those missed draw payments; however, Mylotte concedes that not all missed draw payments were cured.  Mr. Hanselmann in turn admits that Mylotte never tendered any car allowance payments to him at any time during his years of employment.

---

[3]Among the documents constituting Ex. H-22 is a reference to a "letter agreement" between Mr. Hanselmann and Mylotte regarding terms of employment.  Another document in Ex. H-22 mentions that Mylotte had not been able to find it.  At the trial on the involuntary petition, the witnesses seem to agree that no written employment agreement exists.

3

By July 1998, Mylotte was concerned that Mr. Hanselmann was not generating sufficient business for the law firm.  Ex. H-22.  Indeed, his weekly draw amount had been reduced as of October 1997.  Mr. Hanselmann engaged counsel, who proposed in August 1998 that Mr. Hanselmann's compensation be unchanged for nine months while he sought other employment.  Id.  Mylotte replied that it would continue Mr. Hanselmann's employment until the end of the year at his current level of compensation while the parties attempted to work out some agreement that would permit Mr. Hanselmann to remain with Mylotte.  Id.

Apparently, no alternative agreement was reached and Mylotte terminated Mr. Hanselmann's employment effective July 9, 1999.  Ex. H-2.  Just prior to his termination, Mr. Hanselmann's lawyer wrote to Mylotte asserting that there existed "compensation arrearages" owed to him, and seeking firm financial records from 1991 to 1999.  Ex. H-1.  Mylotte, through equity partner Edward J. David, Esquire, replied, in part, by letter dated July 7, 1999:

> As your letter correctly states, during the period of time that Mr. Hanselmann has been with the firm he was not paid draw which was due him at the time.  The exact amount of unpaid draw is presently being calculated. . . .
>
> As to the payment of any sums which are determined to be due Mr. Hanselmann we are not in a position to make a lump sum payment.  However, the firm is amenable to a mutually agreed upon payment plan which reasonably protects Mr. Hanselmann.

Ex. H-2.

These compensation issues were never resolved and Mr. Hanselmann commenced suit in state court against Mylotte and its three equity partners via writ of summons on September 2, 1999, docketed at C.P. Montg. Co. No. 99-15907.  Ex. H-11.

4

As part of litigation discovery, Mr. Hanselmann requested admissions of the defendants.

Ex. H-5.  Among the admissions made by Mylotte was that Mylotte

> 5. failed and/or refused to pay Plaintiff twelve weeks of
> compensation at the rate of $1,884.62 per week as of
> September 30, 1997.

> 6. failed and/or refused to pay Plaintiff four and one-half
> weeks of compensation at the rate of $1,653.85 per week
> from October 1, 1997 until the date of his termination, July 9,
> 1999.

Exs. H-5, H-6, ¶¶ 5, 6.  Later, in supplemental answers to interrogatories, Mylotte

acknowledged that Mr. Hanselmann had not received $31,250.07 in missed draw

payments.  Ex. H-9, ¶¶ 17, 19.

After various discovery and venue disputes were resolved, in August 2003

Mr. Hanselmann filed a pro se a complaint against Mylotte and its three equity partners.

That complaint was later amended.  Ex. A-1.  In his amended complaint, Mr. Hanselmann

asserted that the defendants failed to pay him $30,057.77 in unpaid draw compensation,

and also failed to pay him for 93 months of car allowance at $400 per month (beginning

in October 1991) totaling $37,200; he also demanded unreimbursed expenses totaling

$54.35.  Id.  His amended complaint raised seven causes of action seeking an excess of

$50,000, plus punitive damages, attorneys fees and costs.

Mylotte and its partners defended this lawsuit by denying all liability and

asserting a counterclaim that Mr. Hanselmann wrongfully retained more than $50,000 in

compensation paid to him as an executor of an estate, which compensation rightfully

belonged to the law firm.

After these pleadings were filed, a discovery dispute ensued in this state

court lawsuit and Mylotte was ultimately sanctioned $27,000 by the court.  Mr.

5

Hanselmann then moved for additional sanctions against Mylotte, which the law firm opposed partially on the basis that the firm had insufficient funds.  A hearing was held in state court on January 3, 2006, during which Mr. David testified in response to a question from Mr. Hanselmann: "Well, we have admitted we owe you money"; and "We acknowledge we owe you money."  Ex. A-2 (N.T. at 39, 42).

In 2005, Mylotte moved from Philadelphia to Broomall, Pennsylvania in order to save rent expenses and because it was a smaller law firm and needed less space. Ex. A-2 (N.T., at 13-15).  By January 2006, it had reduced its attorney staff to eight, from a previous high of forty.

On February 5, 2007, Mr. David notified Mr. Hanselmann on behalf of Mylotte that the law firm "will cease doing business at the end of the day on February 9, 2007" and would seek a stay of the state court litigation "in the immediate future."  Ex. H-14.  As a postscript, Mr. David suggested that Mr. Hanselmann drop his lawsuit because "[t]he bank and the City are ahead of you . . . and there isn't enough to pay the bank, much less the City."  Id.

Mylotte indeed did cease all business operations on February 9, 2007.  Two news articles appeared to that effect, both of which were read by Mr. Hanselmann.  Exs. H-15, H-16.  One article referred to the firm's litigation with the City of Philadelphia and with its former landlord, Arden Seven Penn Partners, L.P.  The other article referred to Mylotte's debts to the City of Philadelphia dating back to 1994, plus obligations owed to Arden and to Wilmington Trust Bank.

On March 5, 2007, Mr. Hanselmann moved for the appointment of a temporary receiver in his state court litigation.  Ex. A-3.  Mylotte responded by asserting

6

that, in another action pending against it in the Philadelphia Court of Common Pleas brought by Arden Seven Penn Partnership, judgment had been entered against it and the state court judge had undertaken to "oversee the marshalling [sic] of assets and payment of assets to the appropriate parties and to act as the receiver."  Ex. A-4, ¶ 11.

On March 15, 2007, the City of Philadelphia moved in its own litigation against Mylotte and its "general partners," C.P. Phila. Co. Feb. Term 2005, No. 001479, for the appointment of a receiver for Mylotte.  Ex. H-21.  This motion, a copy of which was sent to Mr. Hanselmann among others, alleged in part that the City held a stipulated judgment against the law firm for unpaid taxes in the amount of $1.7 million, that Wilmington Trust of Pennsylvania held a claim of $650,000, that Mylotte owed Arden Seven Penn Partners, L.P. a judgment in the amount of $377,000, and that B&R Services also held a judgment against Mylotte.  Ex. H-21, at ¶¶ 4, 11-13.

As noted earlier, Mr. Hanselmann filed this involuntary petition on March 23, 2007.  He testified that he did so because he was concerned that Mylotte had made preferential payments to other creditors—but could not identify any such payments—and because no hearing had been scheduled on his state court motion for a receiver.

As articulated at the trial on the contested involuntary petition, Mylotte now maintains that all its non-equity partners agreed at the time of their employment that all draw payments made by the firm were discretionary and made only if funds were available.  Thus, the law firm presently contends that it has no legal liability for missed draw payments to Mr. Hanselmann.  No written document to corroborate this purported agreement with its non-equity partners exists.

7

B.


Before he filed the involuntary bankruptcy petition, Mr. Hanselmann performed legal research at a county law library.  He therefore knew of the three petitioner requirement found in section 303(b)(1).  Mr. Hanselmann acknowledged that he made only one attempt to communicate with any Mylotte creditor before filing his petition: he telephoned MBNA about its claim against Mylotte, without receiving any information from that entity.

Mr. Hanselmann also admitted that he studied court dockets of all lawsuits involving Mylotte, and so he knew of judgments entered in favor of the City of Philadephia, Arden and B&R Services prior to filing his involuntary petition.  He was familiar with a lawsuit brought against Mylotte by Esquire Reporting Services.  He had also obtained a commercial credit report on Mylotte from Equifax, which report listed the City's judgment, and which noted that Mylotte was current on its payments to four unidentified creditors.

As mentioned earlier, Mr. Hanselmann also attended a January 6, 2006 hearing in state court, which hearing involved his request for the imposition of additional sanctions against Mylotte, and Mylotte's assertion that the law firm was in too dire a financial condition to pay any additional sanctions.  Ex. A-2.  During the course of that hearing, Mylotte produced a document reflecting outstanding payables to vendors.  Mr. David, on behalf of Mylotte, testified in state court that the law firm did not intend to pay some of those vendors.  Id., N.T. at 39-40.  Mr. David's testimony also revealed the numerous creditor obligations of Mylotte at that time.

8

Specifically, Mr. David disclosed the following: Mylotte owed its accountant about $50,000. Id., N.T. at 16. It was habitually ten weeks delinquent in paying federal payroll taxes. Id., N.T. at 16, 27. The law firm had been sued by the City of Philadelphia, by Arden Seven Penn Partners, and by a court reporting service known as B&R, as well as a copying service company known as Document Technologies. Id., N.T. at 18, 35. Mylotte had agreed to pay AIG $50,000 in monthly payments of about $1,600 to settle a malpractice claim. Id., N.T. at 18. The law firm had a large outstanding obligation to Wilmington Trust, and also owed money to its insurance premium finance company. Id., N.T. at 21. At the time of this January 2006 hearing, Mylotte was in debt to three law firms—Kolsby Gordon; Masterson Braunfeld; and DiDonato & Winterhalter—who had represented Mylotte in different legal matters. Id., N.T. at 20-21. And, Mylotte had unpaid credit card obligations to MBNA. Id., N.T. at 20. The hearing also revealed that Mylotte's records showed a payable owed to Christine McCafferty, id., N.T. at 42, who was identified in this involuntary dispute as being a former non-equity partner.

As required by Fed. R. Bankr. P. 1003(b), Mylotte's answer in opposition to the involuntary petition included a list of current creditors of the law firm. Ex. H-17. This list of thirty-one creditors, although not complete, see H-18, included Graebel, MBNA, Sir Lancellot Courier, Paul J. Winterhalter, P.C., B&R Services, Masterson Braunfeld, P.C., City of Philadelphia, Esquire Reporting Services and Arden Seven Penn Partners.

Finally, Mylotte conceded at the trial that all four joining creditors held unsecured claims not subject to bona fide dispute and in excess of $12,300. Mr.

9

Hanselmann conceded at trial that Mylotte had twelve or more qualified creditors at the time of his filing the involuntary petition in March 2007.

## II.

Section 303 establishes various requirements before an order for relief can be entered in an involuntary bankruptcy filing. Section 303(h) provides that if an involuntary petition is contested:

> [T]he court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if--
>
> > (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or
> >
> > (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

The petitioning creditor has the burden to establish this element, which is measured as of the date the involuntary petition commenced. See, e.g., Bartmann v. Maverick Tube Corp., 853 F.2d 1540, 1546 (10th Cir. 1988).

"A finding that a debtor is generally not paying its debts 'requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts.'" In re Vortex Fishing Systems, Inc., 277 F.3d 1057, 1072 (9th Cir. 2002) (quoting In re Dill, 731 F.2d 629, 632 (9th

Cir.1984)). "In determining whether a debtor is generally paying its debts as they become

due, courts 'compare the number of debts unpaid each month to those paid, the amount of

the delinquency, the materiality of the non-payment, and the nature of the [d]ebtor's

conduct of its financial affairs.'"  General Trading Inc. v. Yale Materials Handling Corp.,

119 F.3d 1485, 1504 n.41 (11th Cir. 1997) (quoting In re Leek Corp., 52 B.R. 311, 314

(Bankr. M.D. Fla. 1985)); see 1 Norton Bankr. L. & Prac. 2d § 21:11 (2007).

Here, the evidence reflects that Mylotte was not operating at the time of the

involuntary petition.  The firm was unable to pay its bank lender, was routinely delinquent

in federal wage tax withholdings when it was operating, was significantly delinquent in

city taxes, owed its former landlord more than $300,000, had not paid its moving

company when it moved to Broomall in 2005, was unable to pay three law firms

representing it in various litigation, and owed numerous court reporter charges.  These

unpaid debts were substantial, of long standing, and habitual.  Thus, if the only issue were

that posed by section 303(h), Mr. Hanselmann would have met his burden, as Mylotte

was not paying its undisputed debts as they became due.  See generally In re Norris, 183

B.R. 437, 458-59 (Bankr. W.D. La. 1995).

However, section 303(b) establishes a threshold requirement for

commencing an involuntary petition.  It presently states:

> (b) An involuntary case against a person is commenced by the
> filing with the bankruptcy court of a petition under chapter 7
> or 11 of this title--
>
> (1) by three or more entities, each of which is either a holder
> of a claim against such person that is not contingent as to
> liability or the subject of a bona fide dispute as to liability or
> amount, or an indenture trustee representing such a holder, if
> such noncontingent, undisputed claims aggregate at least
> $12,300 more than the value of any lien on property of the

debtor securing such claims held by the holders of such
claims;

(2) if there are fewer than 12 such holders, excluding any
employee or insider of such person and any transferee of a
transfer that is voidable under section 544, 545, 547, 548,
549, or 724(a) of this title, by one or more of such holders that
hold in the aggregate at least $12,300 of such claims[.]

Therefore, if Mylotte had twelve or more qualified creditors at the time Mr.

Hanselmann filed its involuntary petition, three qualified petitioning creditors were

statutorily required to commence an involuntary case.  See, e.g., Atlas Machine & Iron

Works, Inc. v. Bethlehem Steel Corp., 986 F.2d 709, 714 (4th Cir. 1993).  Conversely, if

Mylotte had eleven creditors or less, excluding "(a) claims contingent as to liability, (b)

claims subject to a bona fide dispute, (c) claims of employees of the debtor, (d) claims of

insiders of the debtor, (e) claims of recipients of transfers voidable under 11 U.S.C. §§

544,  545 (statutory liens), 547 (preferences), 548 (fraudulent transfers), 549

(post-petition transfers), or 724(a) (penalty claims)," id., at 715, then a valid involuntary

case could be commenced by only one petitioner.  See, e.g., id., at 714.

Although Mylotte asserts that Mr. Hanselmann claim was the subject of a

bona fide dispute, I can only agree in part.  A bona fide dispute arises only when there is

substantial factual or legal contention as to the claim.  See B.D.W. Associates, Inc. v.

Busy Beaver Building Centers, Inc., 865 F2d 65, 66-67 (3d Cir. 1989); see also In re

Utilimax.com, Inc., 265 B.R. 63, 66 (Bankr. E.D. Pa. 2001)  "In applying this standard,

the petitioning creditor must establish a prima facie case that no bona fide dispute exists."

In re Rimell, 946 F.2d 1363, 1365 (8th Cir. 1991), cert. denied, 504 U.S. 941 (1992); see

also In re Elsa Designs, Ltd., 155 B.R. 859, 863 (Bankr. S.D.N.Y. 1993).  Once a

petitioning creditor has done so, however, the evidentiary burden shifts to the objecting

party to demonstrate that a bona fide dispute does exist.  In re Rimell, 946 F.2d at 1365;

In re Elsa, 155 B.R. at 863.  This burden must be met by some objective evidence of a

bona fide dispute because the statutory standard is not subjective.  In re Rimell, 946 F.2d

at 1365.  Thus, "neither the [objector's] subjective intent nor his subjective belief is

sufficient to meet this burden."  Id.

As to a portion of Mr. Hanselmann's claim—arising from missed draw

payments—the evidentiary record reflects that the petitioner has met his burden but

Mylotte did not meet its burden.  See In re Focus Media, Inc., 378 F.3d 916, 926 (9th Cir.

2004) ("'[I]f at least a portion of the debt that is the subject of the petition is undisputed,

the undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject to

a bona fide dispute.'" (quoting IBM Credit Corp. v. Compuhouse Sys., Inc., 179 B.R.

474, 479 (W.D. Pa. 1995) (and cases cited).  Conversely, as Mr. Hanselmann conceded at

closing argument, his monthly auto allowance claim arising from 1991 is in bona fide

dispute.

At a number of points in the state court litigation, Mylotte has admitted that

it owes Mr. Hanselmann for unpaid draw payments.  It did so in discovery; and it did so

during the sanctions hearing in January 2006.  Even prior to the lawsuit, Mylotte also

acknowledged the existence of a valid debt to Mr. Hanselmann.

Furthermore, its contention at trial in this court—that all partners

understood at the time of their hire that the firm had no legal liability to tender missed

draw payments—is uncorroborated, as well as undermined by correspondence in 1999

promising repayment, albeit over time and after the precise amount had been determined.

13

Thus, the portion of Mr. Hanselmann's claim involving missed draw payments is not subject to a bona fide dispute.

The existence of a pending counterclaim raised by Mylotte against Mr. Hanselmann in the state court litigation does not alter this conclusion.  This counterclaim is based upon Mr. Hanselmann's representation of a client in 1998 and 1999, and involves a transaction unrelated to unpaid compensation due from Mylotte, some of which apparently predates Mr. Hanselmann's representation of that client.  As the counterclaim is in the nature of setoff, rather than recoupment, it does not render Mr. Hanselmann's compensation claim in bona fide dispute.  See In re Focus Media, Inc., 378 F.3d at 926; In re BDC 56 LLC, 330 F.3d 111, 120 (2d Cir. 2003); In re Seko Inv., Inc., 156 F.3d 1005, 1008-09 (9th Cir. 1998); IBM Credit Corp. v. Compuhouse Systems, Inc., 179 B.R. at 479.

Although Mr. Hanselmann's compensation claim qualifies under section 303(b), I need not quantify that claim for purposes of the instant challenge to the involuntary petition, since the evidence presented at the trial also demonstrates that Mylotte had at least twelve qualified creditors.  See generally In re Eastown Auto Co., 215 B.R. 960, 965 (B.A.P. 6th Cir. 1998) (in determining the total number of creditors for purposes of section 303(b), only creditors holding claims not subject to a bona fide dispute are considered); In re Atwood, 124 B.R. 402, 405-06 (S.D. Ga. 1991).  Indeed, Mr. Hanselmann conceded in closing argument that Mylotte proved it had at least twelve qualified creditors on March 23, 2007.  Thus, Mr. Hanselmann's claim, by itself, is insufficient to support an involuntary petition.  As a result, Mylotte demands dismissal of

14

this involuntary petition on the basis that this case violates section 303(b)(1).  See, e.g.,

Atlas Machine & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d at 714.

Mr. Hanselmann responds, however, by relying upon 11 U.S.C. § 303(c),

which states:

> (c) After the filing of a petition under this section but before
> the case is dismissed or relief is ordered, a creditor holding an
> unsecured claim that is not contingent, other than a creditor
> filing under subsection (b) of this section, may join in the
> petition with the same effect as if such joining creditor were a
> petitioning creditor under subsection (b) of this section.

No order for relief or dismissal has been entered in this case, so any joinder requests

would be timely.  Furthermore, at trial, there was evidence that four creditors sought to

join this petition under section 303(c).  In order to properly join an involuntary petition,

the would-be joining creditor must itself hold a claim not subject to bona fide dispute.

Mylotte does not contest that were these four creditors permitted to join in

the involuntary petition, their claims are not subject to any bona fide dispute.  Therefore,

their joinder, if allowed, would meet the three creditor requirement of section 303(b)(1).

See, e.g., In re LaRoche, 131 B.R. 253, 256 (D.R.I. 1991); see generally In re

Utilimax.com, Inc., 265 B.R. at 68.

It is clear from section 303(c) and Fed. R. Bankr. P. 1003(b) that Congress

anticipated that defective involuntary petitions would be filed and section 303(c) was

intended to permit these defects to be corrected with retroactive effect.  See, e.g., In re

Crown Sportswear, Inc, 575 F.2d 991, 993 (1st Cir. 1978); In re Dino's, Inc., 183 B.R.

779, 782 (S.D. Ohio 1995); In re Fox, 1994 WL 484596, at *6 (N.D. Ill. 1994).[4]

Nonetheless, the vast majority of courts, along with various bankruptcy commentators, have concluded that a bankruptcy court may dismiss a defective involuntary petition filed by a single creditor in bad faith, even if additional creditors seek to join in the petition, and even if their joinder would meet the three petitioning creditor requirement.  See, e.g., In re Atlas Machine & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d at 716; Basin Electric Power Cooperative v. Midwest Processing Co., 769 F.2d 483 (8th Cir. 1985); In re Crown Sportswear, Inc., 575 F.2d at 993; Matter of Crofoot, Nielsen & Co., 313 F.2d 170 (7th Cir. 1963); In re R&A Business Associates, Inc., 1999 WL 820859, at *2 (E.D. Pa. 1999); In re Dino's, Inc., 183 B.R. at 782; In re Fox, 1994 WL 484596, at *6; In re LaRoche, 131 B.R. at 256; 2 Collier on Bankruptcy, ¶ 303.09[1] (15th ed. rev. 2007).  As summarized by one bankruptcy treatise:

> The overwhelming majority of courts, however apply a judicially created bad-faith exception to § 303(c).  If a creditor files an involuntary petition with knowledge or reason to know that more petitioners are needed, subsequent cure under § 303(c) is not allowed.  The rationale is that public policy prohibits entertaining any case commenced upon a petitioner's conduct which amounts to fraud upon the court.  This policy is an extension of one formulated by courts

---

[4]Rule 1003 provides:

(b) Joinder of petitioners after filing

If the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses, a brief statement of the nature of their claims, and the amounts thereof.  If it appears that there are 12 or more creditors as provided in § 303(b) of the Code, the court shall afford a reasonable opportunity for other creditors to join in the petition before a hearing is held thereon.

> under the Bankruptcy Act.  While generally permitting
> additional creditors "embodies the . . . charitable attitude
> toward petitions mistakenly asserting that there are less than
> twelve creditors," courts do not permit a fraudulent allegation
> to be cured by intervention.

1 Norton Bankruptcy Law and Practice 2d, § 21:8 (2007) (footnotes omitted) (quoting In re Crown Sportswear Inc., 575 F.2d at 993).

The notion that an involuntary bankruptcy petition can be filed in bad faith is consistent with Third Circuit Court of Appeals' holdings concerning voluntary bankruptcy petitions.  See In re Tamecki, 229 F.3d 205 (3d Cir. 2000) (dismissing chapter 7 filed in bad faith); In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999) (dismissing chapter 11 filed in bad faith); In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (chapter 13 filed in bad faith warrants dismissal).  There is no principled basis to permit a bad faith involuntary bankruptcy filing.  See Shinko v. Miele, 29 Fed. Appx. 890 (3d Cir. 2002) (non-precedential).

Accordingly, if a sole creditor files an involuntary petition in clear violation of section 303(b), knowing that three creditors are needed but hoping that two more will join at a later date, virtually all courts properly dismiss the petition as not being filed in good faith.  See, e.g., Basin Electric Power Coop. v. Midwest Processing Co., 769 F.2d at 486-87; see also Matter of Crofoot, Nielsen & Co., 313 F.2d 170 (7th Cir. 1963).  As expressed by one court:

> Despite the liberal joinder envisioned under § 303(c), the
> three creditor requirement of § 303(b) would be rendered
> meaningless if subsequent joinder of additional parties were
> sufficient in all cases where fewer than three creditors
> originally commenced an involuntary case against a debtor
> who has twelve or more creditors.  Section 303(c) may
> properly be invoked where a single petitioning creditor is
> unaware that a debtor has twelve or more creditors.  But

17

> where, as in this case, a single creditor commences an
> involuntary case despite knowledge that the debtor has twelve
> or more creditors, the petition is deficient and should be
> dismissed absent special circumstances.

Basin Electric Power Coop. v. Midwest Processing Co., 47 B.R. 903, 908 (D.N.D. 1984),

aff'd, 769 F.2d 483 (8th Cir. 1985); see also 2 Collier on Bankruptcy, ¶ 303.09[1] at 303-

72:

> Although barring joinder in bad faith involuntary cases delays
> the entry of the order for relief, there remain some good
> reasons for retaining the judicially created bad faith exception
> to section 303(c).  Good faith has been read into a variety of
> Bankruptcy Code provisions over the years, and as courts of
> equity, bankruptcy courts have been rightly concerned about
> those who subvert the bankruptcy process. . . .  Unlike the
> situation involving improper joint filings, where dismissal and
> refiling are unnecessary, simply substituting a bad faith
> creditor with a good faith creditor may not provide a suitable
> solution; dismissal rather than substitution is the proper
> remedy in that situation.  This encourages good faith filing.

(footnotes omitted);[5] see also 1 Norton Bankruptcy Law and Practice 2d, § 21:8 (2007).

---

[5]The reference in the quotation to a "delay" in the entry of the order for relief
addresses a practical effect of dismissal that in a given instance may be important.

If, as in this case, four creditors seek to join in this involuntary petition, dismissal
of this petition would not prevent those four creditors from filing their own petition.  Therefore,
if they chose to act, an order for relief against Mylotte would likely be entered.  The difference
concerns the reachback period for preferences under section 547 of the Code.  This provision
avoids certain transfers made "on or within 90 days before the date of the filing of the petition . . .
." 11 U.S.C. § 547(b)(4)(A).  If this involuntary petition is not dismissed, the reachback period
will be measured from March 23, 2007, the date Mr. Hanselmann filed the instant petition.  If
this petition is dismissed then the reachback period will be measured from the date a new petition
is filed.

Although Mr. Hanselmann stated that he filed this involuntary petition due to
concerns about preferential transfers, he was unable to specify any particular transfer.  Therefore,
the practical import of the current dispute may not be present.

18

Indeed, the dismissal of an involuntary petition brought improperly by a

single petitioning creditor occurred under the former Bankruptcy Act, even though

joinder by other creditors was generally permissible:

> There is, however, a further ground upon which we think the
> creditor's petition should be dismissed, and that is, that the
> conclusion to be drawn from the primary facts found by the
> master is clear-- that the Lane Shoe Company, on November
> 10, 1928, when it filed the petition, in which it alleged that the
> creditors of the Navison Shoe Company, Inc., were less than
> twelve, did so knowing that the allegation was false; or did so
> recklessly not caring whether the allegation, which it affirmed
> as of its own knowledge to be true, was true or false, and,
> being false, its conduct was a fraudulent attempt to confer
> jurisdiction upon the court, where none existed.

Myron M. Navison Shoe Co., Inc. v. Lane Shoe Co., 36 F.2d 454, 459 (1st Cir. 1929)

(petitioner had received a list of thirty creditors of the alleged debtor just prior to filing its

petition); see In re Crown Sportswear, Inc., 575 F.2d at 993-94; Manning v. Evans, 156 F.

106 (D.N.J. 1907) (only one creditor filed when it was aware that three creditors were

needed); see generally J. Moore, 3 Collier on Bankruptcy, ¶ 59.30, at 647-48 (14th ed.

1977):

> The courts, however, have clearly indicated that intervention
> . . . will not be permitted as a means of improperly conferring
> jurisdiction upon the bankruptcy court.  It may happen that
> creditors, fully knowing that they are estopped from filing a
> petition, or that they do not constitute the required number or
> do not have the requisite amount of claims, may, in defiance
> of such knowledge, file a petition alleging facts to show that
> creditors sufficient in number and amount of claims have
> joined in the petition, in the hope that in the course of the
> proceeding other creditors will intervene . . . and save the
> petition.  Under such circumstances, it is evident that the court
> may properly dismiss the petition and deny the creditors the
> right to intervene . . . .

(footnotes omitted).

19

In general, when evaluating whether an involuntary petition was properly

filed and meets the requirements of section 303, "[g]ood faith is presumed and the debtor

has the burden of proving bad faith by a preponderance of the evidence." In re Ballato,

252 B.R. 553, 558 (Bankr. M.D. Fla. 2000); see also In re Crown Sportswear, Inc., 575

F.2d at 993.  In this instance, Mylotte has the burden to demonstrate that Mr. Hanselmann

"knew or should have known that [Mylotte] had more than 12 creditors" when he filed

the involuntary bankruptcy petition in March 2007.  In re R&A Business Associates, Inc.,

1999 WL 820859, at *2; see 2 Collier on Bankruptcy, ¶ 303.09[1] at 303-70 to 71:

> [T]he Bankruptcy Code prescribes no fixed standard [for bad
> faith], although the current trend is to adopt a standard that
> incorporates both objective and subjective elements.  This
> means that if the petitioning creditor knew or should have
> known that the debtor had 12 or more creditors, a filing with
> fewer than the requisite number is improper, resulting in case
> dismissal rather than joinder.  For example, a creditor cannot
> ignore the results of an investigation the creditor conducts.
> Nor can the petitioning creditor conduct an investigation in a
> manner that it knows will yield incomplete information.
> Good faith can be found lacking when the debtor is of such a
> size that any reasonable person would have known that the
> alleged debtor probably had 12 or more creditors.

(footnotes omitted); see also In re Crown Sportswear, Inc., 575 F.2d at 994; In re Claren,

Inc., 1992 WL 346779, at *1-*2 (E.D. Pa. 1992):

> If a single creditor files an involuntary petition knowing the
> debtor has more than twelve creditors, the petition must be
> dismissed.  Basin Elec. Power Co-Op. v. Midwest Processing
> Co., 769 F.2d 483, 486 (8th Cir.1985), cert. denied, 474 U.S.
> 1083 (1986).  If, however, the petition was filed in good faith,
> the bankruptcy court should allow a reasonable time for other
> creditors to join the petition.  Id.  See also Bankruptcy Rule
> 1003(d).
>
> Bad faith has been defined as The [sic] opposite of "good
> faith," generally implying or involving actual or constructive
> fraud, or a design to mislead or deceive another, or a neglect

20

> or refusal to fulfill some duty or some contractual obligation,
> not prompted by an honest mistake as to one's rights or duties,
> but by some interested or sinister motive.  [The] [t]erm "bad
> faith" is not simply bad judgment but rather it implies the
> conscious doing of a wrong because of dishonest purpose or
> moral obliquity;  it is different from the negative idea of
> negligence in that it contemplates a state of mind
> affirmatively operating with design or ill will.

(citing In re Elsinore Shore Associates, 91 B.R. 238 (Bank. D.N.J. 1988)).

Based upon the evidence presented, I conclude that Mr. Hanselmann knew or should have known that Mylotte had twelve or more creditors when he filed this involuntary petition.

His information sources were Mylotte's financial records in January 2006; testimony about various creditor claims at that time; docket entries of civil actions involving Mylotte; a business credit report about Mylotte; a letter from Mr. Edward David in February 2007; and a copy of the receivership motion filed by the City of Philadelphia in March 2007.  From these sources, Mr. Hanselmann concedes that as of March 23, 2007—the date of his involuntary petition—he was aware that creditors of Mylotte, in addition to himself, included the City of Philadelphia, Arden Seven Penn Partners, B&R Services, Esquire Reporting Services and Wilmington Trust.  In addition to these five creditors and himself though, he had been informed in January 2006 that Mylotte was behind in withholding tax payments to the IRS, owed funds to three law firms—Kolsby Gordon; Masterson Braunfeld; and DiDonato & Winterhalter—had not paid its moving company, Graebel, since 2005, was delinquent in credit card payments to MBNA, was making small monthly payments to AIG on a $50,000 claim, had been sued by Document Technologies, and had an outstanding obligation to its premium finance company.  He had also seen a list of vendor payables as of January 2006.

After January 2006, Mr. Hanselmann learned that certain judgments had been entered against Mylotte, and that the firm had ceased its operations. He also had an Equifax credit report that reflected information sent to that credit reporting agency from four unnamed creditors, stating that Mylotte was current in its payments to those creditors. It is highly unlikely that those four unnamed creditors, reporting that Mylotte was current in payments to them, would have included taxing authorities, or those creditors that had brought suit against Mylotte, or those creditors who had outstanding receivables dating from January 2006 or earlier.

Mr. Hanselmann testified that he believed that all of the vendor creditors had stale claims and so were not qualified creditors under section 303(b).[6] Although that document was not offered in evidence in this contested matter, the hearing transcript from January 2006, Ex. A-2, reveals that this payables ledger included $358,000 in debts, excluding taxing authority claims. Id., N.T. at 16. Included therein were recent

---

[6]Mr. Hanselmann also testified that the state court trial judge at the January 2006 hearing had dismissed Mylotte's aged payables report as "useless," and therefore Mr. Hanselmann felt justified in ignoring it for purposes of filing an involuntary petition. However, from my review of the January 2006 hearing transcript, Ex. A-2, the state court judge never disparaged the aged payables report. Instead, the judge posed questions to Mr. David about the firm's "monthly operating ledger," id., N.T. at 54-55, a completely different document. The court had just been informed that equity partner draws were not included in the operating ledger. Id., N.T. at 56. At that point, the court remarked:

> All right. Well, when I see operating expenses and total revenue, I guess it's — I mean, to me, it's a useless document I guess in that regard.

Id., N.T. at 56.

I do not interpret that comment as opining that the aged receivables listing, which was a completely different document at that hearing, was of no value in assessing the financial condition of the law firm. Rather, the state court judge was concerned that the equity partners were drawing out firm funds for personal expenses from which Mylotte may have been able to pay court imposed sanctions, and there was no record about the amounts of such draws.

22

obligations to AIG, Arden Seven Penn Partners, law firm creditors and MBNA, among others. Id. N.T. at 18, 20-21. Thus, it was not likely that this entire listing would consist of only very old obligations that the firm had no liability to pay. And it was unreasonable of Mr. Hanselmann to ignore those creditors, as well as many others mentioned at the hearing, or to assume that they had been paid in full by March 2007. Indeed, the firm ceased operations because it could not pay its debts, and Mr. Hanselmann knew it.

In sum, Mr. Hanselmann, in the course of his litigation with Mylotte, delved into the financial affairs of the law firm and received considerable information about its finances. As of March 2007, he knew or should have known that Mylotte had a least twelve creditors whose claims were not subject to bona fide dispute.

On one hand, involuntary petitions are favored because they can prevent the diminishment of assets by a debtor and provide equality of treatment among creditors. See In re Elsub Corp., 70 B.R. 797, 813 (Bankr. D.N.J. 1987). On the other hand, the filing of an involuntary petition is a powerful tool in a creditor's arsenal, due to its potential to greatly harm the debtor. After the petition is filed, a debtor may lose its right to transfer or use assets; it may be denied further credit; it may suffer great embarrassment. See In re Morris, 115 B.R. 752, 757 (Bankr. E.D.N.Y. 1990). Thus, it is a weapon that may easily be misused and constraints to insure its proper application are necessary. See In re Dino's, 183 B.R. at 783-84.[7]

This places in conflict the congressional desire "to facilitate bankruptcy proceedings regardless of the correctness of the originating petition," In re Crown

---

[7]Indeed, subsection 303(l) was added in 2005 to protect individuals who are subjected to improper involuntary petitions. As Mylotte is a partnership, that subsection is not applicable.

23

Sportswear, Inc., 575 F.2d 991, 993 (1st Cir. 1978), with a desire not to permit one

creditor to initiate a process requiring three creditors, and in so doing "circumvent unduly

the three creditor requirement of section 303(b)."   Basin Elec. Power Co-op. v. Midwest

Processing Co., 769 F.2d at 486.   The resolution of this conflict which most fairly

balances these competing policies and which comports with likely congressional intent

requires a determination whether the original, single petitioner knew or should have

known that the debtor had twelve or more qualified creditors and so acted in bad faith in

its filing of the involuntary petition alone.

      Since Mr. Hanselmann knowingly ran afoul of section 303(b)(1), the

joinder requests of the four other creditors must be denied and this involuntary petition

will be dismissed, albeit without prejudice to those joinder creditors filing their own

petition if they so choose.   See generally Matter of Smith Ave. Contractors, Inc., 59 B.R.

137 (Bankr. D.N.J. 1986).   Furthermore, Mylotte's answer requests relief under 11 U.S.C.

§ 303(i), necessitating a further hearing.

      An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :      Chapter 7

MYLOTTE, DAVID & FITZPATRICK          :

          Debtor                      :      Bankruptcy No. 07-11861bif

.................................................

ORDER

.................................................

AND NOW, this 12th day of July 2007, for the reasons stated in the

accompanying memorandum, it is hereby ordered that:

1. The joinder requests of Arden Seven Penn Partners, L.P., Graebel

Companies, Inc., Summit Court Reporting, Inc., and Sir Lancellot Courier and Delivery

Service is denied;

2. The involuntary petition filed by Mr. Frederick C. Hanselmann is

dismissed because it does not comply with 11 U.S.C. § 303(b)(1);

3. An evidentiary hearing shall take place on August 24, 2007 at 9:30 a.m.

in Bankruptcy Courtroom #2 to determine, what relief if any, the putative debtor is

entitled to receive under section 303(i).

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Mr. Fredrick C. Hanselmann
117 Forrest Avenue, Suite 217
Narberth, PA 19072

Albert A. Ciardi, III, Esquire
Dimitri L. Karapelou, Esquire
Ciardi & Ciardi, P.C.
One Commerce Square
2005 Market Street, Suite 2020
Philadelphia, PA 19103

Robert Tyler Tomlinson, Esquire
Liederbach Huhn Foy Van Blank & Thompson
892 Second Street Pike, Suite C
Richboro, PA 18954

Mr. Anthony Klondar
Sir Lancellot Courier and Delivery Service
223 South Governor Prince Blvd
Essington, PA 19029